**UNITED STATES of America, ex rel. Albert D. CAMPBELL, Plaintiffs,**

v.

**LOCKHEED MARTIN CORPORATION, Martin Marietta Corporation, Defendants.**

**No. 6:95CV549–ORL–28DAB.**

United States District Court, M.D. Florida, Orlando Division.

Aug. 5, 2003.

Joseph P. Covington, Jodie L. Kelley, Jenner & Block, Washington, DC, for Edward C. Fitzgerald, Martin H. Harris, John P. Loughe.

Ralph E. Hopkins, Karen L. Gable, U.S. Attorney's Office, Orlando, FL, Carolyn G. Mark, U.S. Dept. of Justice, Civil Division, Washington, DC, Andrew Grosso, Law Office of Andrew Grosso, Washington, DC, Michael F. Hertz, Alan E. Kleinburd, Patricia R. Davis, Dodge Wells, Jeffrey M. Cohen, Louis J. Virelli, III, U.S. Dept. of Justice, Washington, DC, for U.S.

Tobe M. Lev, Egan, Lev & Siwica, P.A., Orlando, FL, Andrew Grosso, Law Office of Andrew Grosso, Washington, DC, Pamela B. Stuart, Law Office of Pamela B. Stuart, Washington, DC, for Albert D. Campbell.

Allen J. McKenna, Ford & Harrison LLP, Orlando, FL, James A. Bensfield, Mary Lou Soller, Peter B. Hutt, II, Adam P. Feinberg, Brian A. Hill, Miller & Chevalier, Chartered, Washington, DC, Scott W. McKay, Assistant General Counsel, Litigation and Compliance, Bethesda, MD, for Lockheed Martin Corp., Martin Marietta Corp.

Bradford M. Berry, Miller, Cassidy, Larroca & Lewin, Washington, DC, Jay L. Alexander, Baker Botts, LLP, Washington, DC, for Harold Cates.

Mark D. Maneche, Michael Schatzow, Venable, Baetjer & Howard, LLP, Baltimore, MD, for Greg Snyder.

## ORDER

ANTOON, District Judge.

In this action the United States ("the United States" or "the Government") and its relator, Albert Campbell, seek to recover damages from Defendant Lockheed Martin under the False Claims Act ("the FCA") (31 U.S.C. § 3729) and the Truth in Negotiations Act ("TINA") (10 U.S.C. § 2306a). Plaintiffs contend that Lockheed Martin withheld "cost or pricing data" from the United States Air Force in connection with contracts for the manufacture by Lockheed of LANTIRN pods, despite being obligated to disclose such data under TINA. Additionally, Plaintiffs assert that Lockheed Martin double-billed the Government and submitted false invoices to the Government in connection with several LANTIRN contracts.

This cause is currently before the Court on several motions for summary judgment submitted by the parties: the United States' Motion for Partial Summary Judgment (Doc. 369) ("Motion I"); Defendants' Motion for Summary Judgment on Counts

II–VII of the Government's Complaint (Doc. 374) ("Motion II"); and Defendants' Motion for Summary Judgment on FMS Issues (Doc. 376) ("Motion III").[1] The Court heard oral argument on these motions on July 1, 2003 (*see* Doc. 470) and now issues the following rulings thereon.

## I. Background

### A. Factual Background [2]

Defendant Lockheed Martin ("Lockheed") was formed in 1994 via a merger of Martin Marietta Corporation and Lockheed Corporation.[3] Lockheed is the only manufacturer of LANTIRN ("Low Altitude Navigation and Targeting Infrared for Night") pods, which are targeting and navigation pods used on military aircraft, including F–15s and F–16s. Relator Albert Campbell was formerly employed by Lockheed as Cost Control Chief of the LANTIRN program.

Since the 1980s, the United States Government has entered into several contracts with Lockheed for the production of LANTIRN pods. The LANTIRN pods are manufactured at Lockheed facilities in Orlando, Florida, and Ocala, Florida. In late 1993, the final assembly and test subtasks of the manufacturing process were moved from Orlando to Ocala; this move caused an interruption in production and a "learning loss" that are important to some of the issues in this case.

The first production contract for the LANTIRN system, known as the "USAF contract," was entered into in 1984. Another LANTIRN contract entered into by the Government and Lockheed involved the ultimate sale of LANTIRN pods to Saudi Arabia, Greece, and Bahrain and is referred to by the parties and herein as the "SGB contract." The SGB contract is a sole-source, negotiated contract[4] that was entered into in 1993–1994.

The SGB contract and other contracts that involve the resale of LANTIRN pods (or other defense material) to foreign governments are referred to as "FMS contracts" because they involve "Foreign Military Sales" under the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.* Under that statute, the President and, by designation, the Department of Defense, may sell arms to friendly foreign governments either from stocks of arms or through procurement from American contractors. In procured Foreign Military Sales, the United States Government contracts with a foreign government, and then the United States Government contracts separately with the contractor. The contractor sells the items to the United States Government, which then resells to the foreign government.

In negotiating the SGB contract, the Government and Lockheed first entered

---

1. There is also a fourth summary judgment motion pending: Defendants' Motion for Summary Judgment on Relator's Amended USAF/FMS Complaint (Doc. 380) ("Motion IV"). This motion will be addressed in a separate order.

2. The facts in this section of the Order are taken largely from the United States's Statement of Undisputed Facts (Doc. 370) and Defendants' Statement of Facts (Doc. 424).

3. References to "Lockheed" herein encompass Lockheed Corporation, Martin Marietta, and Lockheed Martin.

4. "Sole-source contracts, by their nature, are not subject to the competitive bidding process, that is, the situation in the case of a sole-source contract is not one where the lowest bid gets the contract. Therefore, sole-source contracts would be open to abuse if the regulations did not impose an obligation that the bids reflect the company's true cost estimates." *United States of America ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1329 n. 8 (4th Cir.1989).

into a letter contract on July 12, 1993; this contract was modified on September 13, 1993. The modification authorized Lockheed to spend no more than $272 million to perform the contract and also authorized Lockheed to begin performance even before agreement was reached on a final price. On November 12, 1993, Lockheed submitted a proposal to "definitize" the SGB contract. The parties conducted factfinding in November and December 1993, and after this factfinding Lockheed submitted an updated proposal on February 21, 1994.

Because of cash-flow problems with one of the purchasing foreign countries, Lockheed was asked to restructure its SGB contract proposal, and in compliance with that request Lockheed submitted a restructured proposal on June 16, 1994. A final update to the proposal followed on August 3, 1994. The parties engaged in further face-to-face negotiations at Wright Patterson Air Force in Ohio in late August 1994 and agreed to a contract price of $450,748,730 for 67 target pods and 72 navigation pods.

The parties established a certification date of September 22, 1994, and Lockheed certified that as of that date all "cost or pricing data" submitted in support of Lockheed's proposal was "current, accurate, and complete." The date of final contract "definitization" was October 25, 1994.

Normally, Lockheed estimated future performance of its production line, or "touch labor," based on actual historical performance of such workers. Lockheed kept data on how long it took workers to perform tasks, and typically that data would show an increase in efficiency over time. However, as noted earlier, during the time that the SGB contract was being negotiated, Lockheed was planning to move, and ultimately did move, the location of some of its LANTIRN manufactur-

ing tasks from Orlando to Ocala. Because of this expected location shift, Lockheed informed the Air Force that in preparing its proposal Lockheed could not use its normal labor cost-estimate method based on performance history but instead would use a theoretical construct known as "the Anderlohr method" to estimate its labor costs for the SGB contract.

"The Anderlohr method" is a way of estimating the "lost learning" that occurs when there is a line break or other disruption in manufacturing such as the move of some tasks from Orlando to Ocala. Under this method, although more than 600 LANTIRN pods had been produced (on prior contracts from late 1989 until late 1993) at the time of the SGB negotiations, Lockheed's estimate was that final assembly tasks would be performed with the efficiency of the 85th pod rather than the 600th pod; Lockheed thus "proposed to start the learning curve for SGB at that point and assume" that efficiency on the SGB contract "would come down the learning curve at the same rate which had been experienced in the past." (Doc. 370 ¶ 15). Although Lockheed's normal estimation procedures—based on performance history—were used for other portions of LANTIRN production, for the "old Ocala scope" work for which there was likely to be a loss-of-learning effect from the line break, the Anderlohr method was used. The Air Force propounded questions to Lockheed about the Anderlohr estimation method, and David Karr, an industrial engineer for the Air Force, prepared a technical evaluation of Lockheed's SGB proposal.

While the SGB contract negotiations were ongoing, Lockheed was producing LANTIRN pods in Ocala on two other Air Force contracts—Peace Nightlight II ("Peace Nightlight") and Peace Marble 3 Buy 2 ("Peace Marble"). After the final

assembly tasks were moved to Ocala, the Peace Nightlight pods were at the final assembly stage; the Peace Marble pods were at all stages of production; and Lockheed had started work on some of the SGB pods. By August 1994, 27 target pods had completed final assembly and testing, as had 17 navigation pods.

During the SGB contract negotiations, Mr. Karr asked Lockheed for the most current performance data. In January 1994, Lockheed Martin provided Mr. Karr with data on 2½ units that had been completed in Ocala, but upon review Mr. Karr concluded that "too few units had been employed for [him] to draw any conclusions about the rate of learning after the move." (Aff. of David Karr, Ex. 11 to Doc. 370, at ¶ 12). Mr. Karr asked for more "touch labor" data for final assembly in April 1994 and Lockheed complied, but Mr. Karr again concluded that there were not enough completed units for him to draw any conclusions. (Karr Aff. at ¶ 14).

In June 1994, Mr. Karr was replaced in the negotiation process by Kurt Bledsoe. Mr. Bledsoe reviewed those parts of Lockheed's June proposal that differed from its February proposal, but he did not ask for information related to the Orlando–to–Ocala move. Moreover, in its June 1994 updated proposal, Lockheed did not include actual performance data for the three LANTIRN contracts (Peace Nightlight, Peace Marble, and SGB) that were underway, nor did Lockheed otherwise provide that information to the Air Force contracting team. Lockheed did, however, provide some cumulative actual performance data relating to the SGB contract; the Government claims that this data could not be related back to the SGB proposal. When Lockheed again updated its proposal in August 1994, the information regarding Ocala touch labor (both "old Ocala scope" and "final assembly scope") was unchanged from the February proposal; the

update did not reflect actual performance data collected after Lockheed's move from Orlando to Ocala.

On October 4, 1994, Lockheed certified that all of the "cost or pricing data" submitted with the proposal was "current, accurate, and complete" as of September 22, 1994. Additionally, a subcertification was signed by Lockheed employees Brian Cardinal, Greg Snyder, and Scott Konrath certifying that the data submitted by Ocala was "current, accurate, and complete" as of September 16, 1994.

During production of the LANTIRN pods pursuant to its contracts with the Government, Lockheed periodically submitted invoices to the United States in the form of progress payment requests. The Government and the Relator contend that some of these progress payment requests, as well as invoices known as "DD 250 forms" that Lockheed submitted, were false; these documents form the basis of the Plaintiffs' False Claims Act claims.

### B. Procedural Background

This action was initiated on May 30, 1995, with the filing of a Complaint (Doc. 1) by the Relator under the False Claims Act. Upon motion by Lockheed (Doc. 121), the matter was stayed by the Court on August 19, 1997. The stay was lifted and the case reopened on April 16, 2001 (Doc. 200, filed April 16, 2001); while the stay was in effect the case was reassigned to the undersigned United States District Judge. After the case was reopened, the Government intervened and filed a Complaint of its own (Doc. 237).

There are three active Complaints in the case: the Relator's Amended "SGB Complaint" (Doc. 105, filed June 26, 1997); the Relator's Amended "USAF/FMS Complaint" (Doc. 106, filed June 26, 1997); and the Complaint of the United States as

Intervenor (Doc. 237, filed November 20, 2001).

In his SGB Complaint (Doc. 105), Relator alleges three counts, all of which remain before the Court. In Count I, Relator alleges cost mischarging and false claims on the targeting and navigation LANTIRN pods in the SGB Contract beginning in October 1994; in Count II, Relator alleges ICS management double-billing from October 1994 to May 1996; and in Count III, Relator alleges that Lockheed fraudulently billed the Government for obsolete parts and lifetime-buys under the SGB contract.

In his USAF/FMS Complaint (Doc. 106), Relator asserted ten counts, the following six of which remain pending[5]: Count I—cost mischarging and false claims in the USAF and Early FMS contracts; Count II—a reverse false claim on the Early FMS contracts; Count V—defective pricing and false claims in the Later FMS contracts—Peace Nightlight II; Count VI—defective pricing and false claims in the Later FMS contracts—Peace Marble 2; Count VII—defective pricing and false claims in the Later FMS contracts—SGB; and Count VIII—defective pricing and false claims in the Later FMS contracts—Peace Fox.

In its Complaint (Doc. 237), the United States alleges seven counts, all of which arise under the SGB contract and five of which are still pending[6]: Count I—violation of the False Claims Act by presentment of false or fraudulent claims for payment or approval; Count II—violation of TINA by failing to provide the Air Force with all "cost or pricing data" available to Lockheed on the date of certification of the data; Count III—misrepresentation of costs and fraudulent inducement to enter into the SGB contract; Count IV—breach of contract due to double-billing; and Count V—breach of contract due to mis-charging of unallowable costs.

The parties' summary judgment motions directed at various portions of these complaints are now ripe for ruling.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

---

**5.** Counts III, IV, IX, and X have previously been dismissed. (Docs. 305, 306, & 469).

**6.** At the conclusion of the July 1, 2003 oral argument on the summary judgment motions, the Court granted summary judgment to Lockheed on Counts VI and VII of the Government's Complaint—for unjust enrichment and payment by mistake, respectively—in light of the parties' stipulation as to the existence of a contract. (*See* Docs. 469 & 470).

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

### B. The Merits of the Parties' Summary Judgment Motions

*Motion I—the United States' Motion for Partial Summary Judgment (Doc. 369)*

In Motion I (Doc. 369), the United States contends that it is entitled to summary judgment as to Count II of its Complaint (Doc. 237), which alleges that Lockheed violated the Truth in Negotiations Act ("TINA"). Specifically, in this motion the United States seeks summary judgment on three issues: (1) that Lockheed violated TINA when it failed to disclose current, accurate, and complete "cost or pricing data" to the Air Force regarding the SGB contract; (2) that the United States is entitled to a reduction in the contract price due to defective pricing; and (3) that the United States is entitled to double damages because Lockheed's violation of TINA was a "knowing" violation. However, Lockheed maintains that there are genuine issues of material fact as to each of these points which preclude summary judgment for the Government on Count II.

TINA requires that contractors provide certified "cost or pricing data" to the government on all negotiated contracts—like those at issue in this case—that are worth at least a certain threshold value. Specifically, in this regard TINA provides that the contractor must "certify that, to the best of the [contractor's] knowledge and belief, the cost or pricing data submitted are accurate, complete, and current." 10 U.S.C. § 2306a. "Cost or pricing data" is defined in TINA as "all facts that, as of the date of agreement on the price of a contract ... a prudent buyer or seller would reasonably expect to affect price negotiations significantly. Such term does not include information that is judgmental,

but does include the factual information from which a judgment was derived." 10 U.S.C. § 2306a. The pertinent Federal Acquisition Regulation ("FAR") further delineates the parameters of what constitutes "cost or pricing data," providing:

> Cost or pricing data are factual, not judgmental, and are therefore verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred. They also include such factors as (a) vendor quotations; (b) nonrecurring costs; (c) information on changes in production methods and in production or purchasing volume; (d) data supporting projections of business prospects and objectives and related operations costs; (e) unit-cost trends such as those associated with labor efficiency; (f) make-or-buy decisions; (g) estimated resources to attain business goals; and (h) information on management decisions that could have a significant bearing on costs.

48 C.F.R. § 15.801 (1994). If the information provided to the Government contract negotiators is "defective"—that is, inaccurate, incomplete, or noncurrent—the Government is entitled under TINA to an adjustment to the contract price. 10 U.S.C. § 2306a(e).

The United States contends that despite Lockheed's certification to the contrary, Lockheed failed to provide the Air Force with current, accurate, and complete "cost or pricing data" as required by TINA. To prevail on a claim of defective pricing under TINA, the burden is on the

Government to establish: (1) "that the information at issue is 'cost or pricing data' within the meaning of TINA"; (2) "that the cost or pricing data was either not disclosed or not meaningfully disclosed to a proper government representative"; and (3) "detrimental reliance on the defective data and . . . the amount by which the final negotiated price was overstated." *United States v. United Techs. Corp., Sikorsky Aircraft Div.*, 51 F.Supp.2d 167, 189 (D.Conn.1999). There is a presumption that undisclosed information, if disclosed, would have resulted in a dollar-for-dollar lowering of the contract price, and once the Government establishes nondisclosure of cost or pricing data, the burden shifts to the contractor to prove that the Government did not rely on the defective data. *See, e.g., Sylvania Elec. Prods., Inc. v. United States*, 202 Ct.Cl. 16, 479 F.2d 1342, 1349 (1973).

*Did the Ocala work performance information constitute "cost or pricing data" under TINA?*

■ The first question that must be answered is whether information accumulated by Lockheed at its Ocala plant between January and September 1994 constitutes "cost or pricing data." There is no question that at the time Lockheed certified the currency, accuracy, and completeness of its "cost or pricing data," Lockheed had accumulated eight months' worth of actual performance data at its Ocala facility and had performed its own analysis of the information. This data allegedly established that the Ocala workforce was more efficient than Lockheed had estimated it would be in the SGB proposal and that Lockheed's estimated number of required labor hours submitted to the Air Force negotiating team was inflated. According to the Government this omission renders Lockheed's mandatory disclosure defective and thus violative of TINA. Lockheed admits that the data from the Ocala plant

was not timely delivered to Mr. Karr, but it rejects the Government's assertion that the data constitutes "cost or pricing data" as contemplated by TINA because, Lockheed maintains, the data was speculative and incomplete and therefore insignificant.

In deciding whether information in the possession of a contractor constitutes "cost or pricing data" under TINA it is necessary to consult the actual text of the statute as well as case law interpreting its provisions. TINA itself provides an objective test on this point, defining "cost or pricing data" as "all facts that, as of the date of agreement on the price of a contract (or the price of a contract modification), a prudent buyer or seller would reasonably expect to affect price negotiations significantly." 10 U.S.C. § 2306a (1994); *see also In re Grumman Aerospace Corp.*, ASBCA No. 27,476, 86-3 BCA ¶ 19,091, 1986 WL 20110 (ASBCA May 29, 1986) ("[A]n objective test, whether the undisclosed data would be reasonably expected to have a significant effect upon price negotiations, is applied."). TINA further provides that "cost or pricing data" "does not include information that is judgmental, but does include the factual information from which a judgment was derived." 10 U.S.C. § 2306a (1994).

The Ocala work performance data qualifies under the first part of this statutory definition because it was an accumulation of facts in existence at the time the final contract price was set. Moreover, actual labor hour performance data accumulated at a contractor's facility would ordinarily be "cost or pricing data" and the kind of information the Government would want to consider prior to entering an agreement. *See, e.g., Singer Co., Librascope Div. v. United States*, 217 Ct.Cl. 225, 576 F.2d 905 (1978) (holding that downward trending labor costs were "cost or pricing data" under TINA); *In re Lambert Eng'g Co.*,

ASBCA No. 13,338, 69–1 BCA ¶ 7663, 1969 WL 934 (ASBCA Apr. 30, 1969) (concluding that number of actual hours of direct manufacturing labor was TINA "cost or pricing data" which contractor should have updated through the date of agreement on price). Such information would be of even greater interest to the Government if the contractor had analyzed the data. *See, e.g., In re Grumman Aerospace Corp.*, ASBCA No. 27,476, 86–3 BCA ¶ 19,091, 1986 WL 20110 (ASBCA May 29, 1986) (finding that entirety of "cost analysis report," consisting of narrative analysis and statistical data, was "of such a nature to warrant its disclosure as cost and pricing data" but that nondisclosure did not affect the contract price in light of contractor's "disclosure of more current information and the Government's independent knowledge"); *Lambert Eng'g; In re Aerojet–Gen. Corp.*, ASBCA No. 12,264, 69–1 BCA ¶ 7664, 1969 WL 591 (ASBCA Apr. 29, 1969) (finding that cost estimates and engineering analyses which concluded that subcontractors' costs were overstated were TINA "cost or pricing data" that should have been disclosed to the government).

Lockheed does not dispute the statutory definition of "cost or pricing data" but maintains that the Ocala data was merely its estimate or judgment as to future costs and therefore not the kind of data "prudent buyers or sellers would reasonably expect to affect price negotiations significantly" under TINA. Furthermore, Lockheed argues that the work performance data in question are not "facts that can reasonably be expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred" as provided in F.A.R. (48 C.F.R.) § 15.801. In sum, Lockheed maintains that it was not reasonable for the Air Force to rely upon the Ocala labor performance data because the information was incomplete and unreliable and because it had been accumulated over a period of very limited duration. Because their experts offer opinions that the Ocala work data could not be reasonably relied upon by the parties to the contract, Lockheed contends that it would be error to grant the Government's motion for summary judgment on this point. Reliability, Lockheed suggests, is necessarily a jury question.

Indeed, the record contains testimony downplaying the relevance of the Ocala work data. Henry Eskew, Lockheed's expert witness, testified that the data in question was insufficient to establish a learning curve at the Ocala plant or to determine the impact of Lockheed's move to Ocala. This testimony was offered in response to Mr. Karr's statement that if he had been provided the information he would have used it to establish a learning curve to be used in negotiations. The Lockheed project manager also suggests that the information would not have been helpful to negotiators. He explained that prior to the test and final assembly work being moved to Ocala in 1994, the Ocala workers had not done final assembly work; all "touch" laborers in Ocala were performing work they had never done before and required training. According to the manager, much of the "touch" work at the Ocala plant was done by engineers whose hours were not recorded. These factors, according to the manager, rendered the Ocala work data unreliable.

The former Lockheed manager of the Ocala plant also testified that the data must be accumulated over at least a one-year period to be useful. Other Lockheed employees agreed with this assessment because units or blocks were at various stages of production. Lockheed points out that to rely on this incomplete data is contrary to the instructions set forth in the Defense Contract Audit Agency's publication, "Defective Pricing Workbook," which provides that "current" data for TINA

purposes means data from "all completed production blocks, or lots." While it did not rely on the incomplete work at the Ocala plant, Lockheed contends its estimates were based on the much more meaningful data disclosed regarding their completion of 1,200 LANTIRN pods over a five-year period [at Lockheed's Orlando plant] as well as application of the Anderlohr theory, which is not based on actual data. Underscoring its view that the Ocala figures were insignificant, Lockheed points out that it did not rely on Ocala work performance data until 1995, after data had been accumulated for an entire year. Lockheed maintains a jury issue exists because the testimony it has provided is contrary to testimony offered by the Government as to whether data regarding incomplete production blocks collected over an eight-month period could be construed as reliable.

The underlying purpose of TINA is to provide a system of procurement that maximizes the Government's ability to fairly protect tax dollars. To that end, TINA imposes a duty on Government contractors to "completely disclose cost and pricing information" to the Government. *M–R–S Mfg. Co. v. United States*, 203 Ct.Cl. 551, 492 F.2d 835, 841 (1974). By making sure the government has the contractor's cost and pricing data, TINA levels the playing field. But, if TINA is to have the intended "force and effect[,] then the Government must be clearly and fully informed. This can only be achieved by complete disclosure." *Sylvania Elec. Prods. v. United States*, 202 Ct.Cl. 16, 479 F.2d 1342, 1348 (1973).

Although Lockheed argues that the Government was aware that Lockheed was basing its labor hour estimate on the Anderlohr method rather than actual data, this contention misses the point. Even though the Air Force representative, Mr. Karr, was aware of the Anderlohr method

and in fact agreed with its use to provide a starting point on the learning curve, the actual data would certainly be considered important to a prudent buyer like the Government. To be sure, Mr. Karr has testified that he disagreed with Lockheed's estimate of the rate of learning; Mr. Karr thought that the Ocala workers would learn their new tasks faster than Lockheed projected they would. The actual Ocala data could certainly have a bearing on Mr. Karr's negotiation position; he could interpret it as proving him right and therefore be less willing to bend on his position.

Even if Lockheed thought that the data was not important on the rate-of-learning issue—due to the fact that engineers, rather than the usual "touch" laborers, were doing much of the work reflected in that data, or that easier parts of the manufacturing process were done first—Lockheed was still obligated to furnish this information to the Government and then to try to make its case that the data was not significant. "The [contractor]'s duty is to disclose all data which might affect the contract price. [The contractor] can argue about the relevance and cyclical nature of the disclosed information later. But it has an obligation to disclose it. It cannot unilaterally decide what can be disclosed and what cannot. The duty imposed by the law is for the [contractor] to disclose." *Singer*, 576 F.2d at 918 (citation omitted); *cf. Aerojet Solid Propulsion Co. v. White*, 291 F.3d 1328, 1331 (Fed.Cir.2002) (affirming decision of Armed Services Board of Contract Appeals that contractor had obligation under TINA to disclose to government the existence of sealed subcontractor bids for nitroethane, noting that "[w]ith chemical prices fluctuating wildly, a reasonable buyer or seller would recognize that mere knowledge of the undisclosed sealed nitroethane bids might give one negotiator an advantage during contract price negotiations" and therefore constituted "cost or pricing data" under TINA).

The actual labor performance data for the Ocala facility accumulated over an eight-month period in 1994 was data that was factual and verifiable and which "a prudent buyer or seller would reasonably expect to affect price negotiations significantly." Hence, under the objective standard set forth in TINA, the eight months' worth of Ocala performance data meets the TINA definition of "cost or pricing data" and should have been disclosed to the Government during negotiations. To this extent, the Government's motion for partial summary judgment (Doc. 369) shall be granted.

*Was the "cost or pricing data" delivered to the Air Force in accordance with TINA?*

 The next question to be addressed is whether Lockheed disclosed the Ocala work performance data to the Air Force. TINA requires disclosure of cost or pricing data and the Government states that there are no facts contained in this record establishing that Lockheed made disclosure. Lockheed states physical delivery of the data is not required and several Air Force representatives, including Mr. Karr, knew about the data's existence. Also, Lockheed was operating under a military standard that required its personnel to track contract performance on a monthly basis.

On this issue, the Court finds many discrepancies in the record that preclude summary judgment. Although it is undisputed that Lockheed did not include actual labor data in its updated proposals throughout 1994, there are inconsistencies among the witnesses regarding what information was otherwise disclosed and when information was provided to or otherwise known by the Air Force. Naturally, in light of these discrepancies there also are many issues remaining as to the Government's reliance on allegedly defective data and the amount of damages, if any. Thus, to the extent the Government seeks summary judgment on these matters, the motion is denied and these issues will have to be resolved by the jury.

*Motion II—Defendants' Motion for Summary Judgment on Counts II–VII of the Government's Complaint (Doc. 374)*

 In Motion II (Doc. 374), Lockheed contends it is entitled to summary judgment on Counts II through V[7] of the Government's Complaint (Doc. 237) because these claims are barred by the applicable statutes of limitations. Lockheed asserts that Counts II (TINA), IV (Breach of Contract), and V (Breach of Contract) are barred by the six-year period prescribed in 28 U.S.C. § 2415(a) and that Count III (Misrepresentation) is tort-based and subject to the three-year limitation period in 28 U.S.C. § 2415(b).[8] In response, the

---

7. In this motion, Defendant also argued that Counts VI and VII of the Government's Complaint—for unjust enrichment and payment by mistake, respectively—are precluded by the express contract between the parties, the existence of which bars claims sounding in quasi-contract. At the conclusion of the oral argument on the summary judgment motions, the Court ruled in favor of Defendant as to Counts VI and VII, finding that the parties' stipulation as to the existence of a contract barred these quasi-contractual claims. (*See* Docs. 469 & 470). Hence, those counts are no longer before the Court. In any event, the analysis set forth in the text as to the timeliness of the other counts applies with equal force to Counts VI and VII.

8. 28 U.S.C. § 2415 provides in pertinent part:

(a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues ....

(b) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred un-

United States argues that pursuant to Federal Rule of Civil Procedure 15(c)(2)[9] all of these counts relate back to the filing of Relator's Complaint and therefore are timely. The Government further argues that even if its claims do not relate back, the Court's stay of this case tolled the applicable statutes of limitations. The Government is correct on both points, and accordingly all of its claims were timely filed.

" 'The starting point for [this] analysis is [Federal Rule of Civil Procedure 15(c) ], which deals with the relation back of pleading amendments.' " *Woods Exploration & Producing Co., Inc. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1299 (5th Cir. 1971) (quoting *Williams v. United States*, 405 F.2d 234, 236 (5th Cir.1968)). Essentially, Rule 15(c) permits an amended pleading to relate back to the date of an original pleading "when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R.Civ.P. 15(c)(2); *see also Woods*. " 'Rule 15(c) is "based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced." ' " *Woods*, 438 F.2d at 1299 (quoting *Williams*, 405 F.2d at 236 (quoting 3 James Wm. Moore, Moore's Federal Practice ¶ 15.15(2), at 1021)).

" 'The Federal rule on the "relation back" of amendments to pleadings, as embodied in Federal Rule 15(c), is permissive. As long as the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment; even new defendants and new theories of recovery will be allowed.' " *Williams*, 405 F.2d at 237 (quoting *Travelers Ins. Co. v. Brown*, 338 F.2d 229, 234 (5th Cir.1964)).

Here, it is undisputed that the Relator filed his initial Complaint (Doc. 1) on May 30, 1995, which is within the time allotted by the pertinent statutes of limitations. The Relator's complaint alleges that Lockheed violated the FCA in connection with the SGB contract. Counts II through V of the Government's Complaint are based upon the same conduct, transaction, and occurrences regarding the SGB contract as alleged in the Relator's Complaint, and therefore under Federal Rule of Civil Procedure 15(c)(2) the Government's Complaint relates back to the Relator's Complaint and the Government's claims are timely.

■ Moreover, even if the Government's claims did not relate back to Relator's Complaint under Rule 15, Counts II through V would still be timely in light of the Court's stay of these proceedings from August 19, 1997 through April 16, 2001 (Doc. 200). A stay or other legal proceeding that prevents a party from exercising a legal remedy " 'can be held to toll the operation of a statute of limitations.' " *United States v. Brichat*, 129 B.R. 235, 238 (D.Kan.1991) (quoting *Hines v. United States*, 760 F.Supp. 549, 554 (D.S.C.1991)); *see also Selph v. Nelson, Reabe & Snyder, Inc.*, 966 F.2d 411, 412 (8th Cir.1992) (explaining that a stay tolls the statute of

---

less the complaint is filed within three years after the right of action first accrues ....

**9.** Federal Rule of Civil Procedure 15(c)(2) provides: "Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading ...."

limitations, which avoids the risk that a plaintiff's cause of action will be time-barred). Additionally, the Government is correct that 28 U.S.C. § 2416—to which section 2415 is expressly subject—provides that in computing limitations periods, spans of time during which the defendant is exempt from legal process are not to be included.

As noted by the Government, "counting from the filing of Relator's complaint to the filing of the United States' complaint, and subtracting the term of the Court's stay, the limitations period ran for less than two years and ten months between the filing of Relator's complaint and the United States' complaint. This period is less than either of the statutes of limitations Lockheed [ ] contends were violated by the United States." (Doc. 419 at 13). Thus, the Government's claims were timely filed.

Also in Motion II, Lockheed seeks summary judgment on the breach of contract claims, contending that it is uncontested that Lockheed repaid to the Government the amount that had been overpaid. However, the Government responds that notwithstanding the repayment, at a minimum it is entitled to interest on the amount that was overpaid. At oral argument, the parties represented that an agreement as to *some* of the disputed amounts had been reached, but there remain some unresolved material factual issues as to the amounts involved. Hence, Lockheed's motion for summary judgment on this point shall be denied.

In accordance with the foregoing, Lockheed's Motion for Summary Judgment on Counts II–VII of the Government's Complaint (Doc. 374) shall be denied except to the extent that it was granted on Counts VI and VII at oral argument.

*Motion III—Defendants' Motion for Summary Judgment on FMS Issues (Doc. 376)*

In Motion III, Lockheed seeks summary judgment on "FMS issues." In this motion Lockheed contends that it is entitled to summary judgment on Count I of the Government's Complaint (Doc. 237), on Counts I–III of the Relator's Amended SGB Complaint (Doc. 105), and on Counts V and VII of the Relator's Amended USAF/FMS Complaint (Doc. 106) because the Government and the Relator cannot establish that Lockheed submitted "claims" within the meaning of the False Claims Act with respect to the pertinent contracts—the "SGB Contract" for sale of LANTIRN pods to Saudi Arabia, Greece, and Bahrain and the "Peace Nightlight II Contract" for sale of LANTIRN pods to South Korea.

The counts to which this motion is directed allege that Lockheed violated 31 U.S.C. § 3729(a)(1) and (a)(2), which provide as follows:

(a) Liability for certain acts.—Any person who -

(1) knowingly presents, or causes to be presented, to an officer or an employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

. . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a) (1993). Although "claim" is not specifically defined in the False Claims Act, subsection 3729(c) provides that "[f]or purposes of this section, 'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

Lockheed contends that the False Claims Act applies only to claims which threaten the infliction of a "financial loss" on the United States Government and that the statute is not implicated when the United States acts merely as a fiduciary to disburse third-party property and its own funds are not at risk. Lockheed reasons that because its requests for payment under the SGB and Peace Nightlight II Contracts were to be satisfied from "foreign funds" held in the foreign countries' accounts in the FMS Trust Fund—money that is merely in the temporary possession of United States officials—these requests for funds did not threaten U.S. funds. Thus, Lockheed argues, even if the invoices were "false" there is no False Claims Act liability because only foreign government funds were at a risk of loss.

In opposition to Lockheed's motion, the Government attacks the assertion that the funds in the FMS Trust Fund were not United States funds, explaining the structure of the FMS program. In the FMS scheme, there are two separate transactions involved and the Government is a party to both. In the first transaction, the Government enters into an agreement (an "LOA") with a foreign government to sell pods to the foreign government, and in the second transaction the Government contracts with Lockheed for the purchase of the pods, which are then resold to the foreign government. Lockheed is not a party to the first transaction, and the foreign government is not a party to the second. The Government argues that its contract with Lockheed was like any other Government contract and the applicability of the False Claims Act does not depend on whether the Government collected money from a third party before or after its payment to Lockheed. Once funds are deposited into the FMS Trust Fund, they become funds of the United States and are subject to U.S. Treasury account system controls from the date of receipt until the date of expenditure.

In support of its contention that no "claim" within the meaning of the FCA is involved here, Lockheed relies on several cases in which courts have suggested that loss or potential loss to the United States Government is a prerequisite to an FCA action. However, these cases are distinguishable. For example, Lockheed relies heavily on *United States v. Cohn,* 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926), a case involving criminal charges against an importer of cigars for obtaining possession of the cigars from the customhouse by fraud. In affirming the dismissal of the indictment against Cohn, the United States Supreme Court stated that no "claim" had been made upon or against the Government because there was no "claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant." 270 U.S. at 345, 46 S.Ct. 251. However, in the instant case the Government clearly was liable under the contracts to pay Lockheed for the LANTIRN pods, and the claims were presented to the Government for payment by the Government; thus, *Cohn* is not on point. *See also, e.g., United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 674 (5th Cir.2003) (noting that the False Claims Act covers a claim "which is made to someone—including the

government itself—who will at least in part use government money or property to pay it").

In contrast to *Cohn* and other cases relied upon by Lockheed, the Supreme Court reached a different result in *United States v. Neifert–White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968), a False Claims Act case involving the sale of grain storage bins at falsely inflated prices with the purpose of inducing a federal agency, the Commodity Credit Corporation, to extend loans to the seller's customers for amounts exceeding that permitted by statute. There, the Court held that an FCA claim was stated based on the submission of overpriced invoices to the federal agency with the loan applications that were relied upon by the agency. The Court, distinguishing *Cohn*, noted that "[i]t is sufficient to note that the instant case involves a false statement made with the purpose and effect of inducing the Government immediately to part with money" and that the FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." 390 U.S. at 232–33, 88 S.Ct. 959.

Lockheed argues that the False Claims Act does not apply to requests for the United States government to make payment as a fiduciary of third-party funds. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir.2001) (holding that inflated legal bills submitted to Bankruptcy Court for payment from bankrupt estates administered by the United States trustee were not claims for government funds and thus there was no cause of action under False Claims Act), *cert. denied*, 536 U.S. 906, 122 S.Ct. 2360, 153 L.Ed.2d 182 (2002); *United States ex rel. Bustamante v. United Way*, No. 98C5551, 2000 WL 690250 (N.D.Ill. May 25, 2000) (finding that voluntary contributions from federal employees' paychecks to United Way were employees' personal funds rather than "federal" funds and therefore there was no False Claims Act liability). However, these cases relied upon by Lockheed are easily distinguishable because money was not sought from the United States Treasury as in the instant case.

Lockheed's position regarding what constitutes a "claim" under the FCA is based upon the premise that the money in the FMS Trust Fund belongs not to the United States but the foreign governments. However, this premise is flawed. Although Lockheed relies on decisions made by the Comptroller General (the head of the General Accounting Office or "GAO") in connection with bid protests of FMS contract awards, these decisions do not compel the conclusion urged by Lockheed.

For example, in *In re Procurements Involving Foreign Military Sales*, B–165731, 58 Comp. Gen. 81 (Nov. 16, 1978), the Comptroller General reconsidered its prior position regarding whether it would consider private party complaints involving FMS procurements. In this opinion and in others,[10] the Comptroller did make sev-

---

**10.** *See also In re Goddard Indus., Inc.*, B–275643, 97–1 Comp. Gen. Proc. Dec. ¶ 194, 1997 WL 106100, at *1 (Mar. 11, 1997) (stating that the Arms Export Control Act "authorizes the Department of Defense, acting as an agent for a foreign country and using funds of that country that have been deposited in the FMS Trust Fund Account, to enter into contracts for purposes of resale to the foreign countries"); *In re Optic–Electronic Corp.*, B–234885, 89–2 Comp. Gen. Proc. Dec. ¶ 326, 1989 WL 241221, at *2 (Oct. 6, 1989) (noting

that "[g]enerally, the Department of Defense acts as an agent for a foreign government when it conducts procurements under the authority of the Arms Export Control Act, using the foreign government's funds that have been deposited in the FMS Trust Fund Account in the Treasury"); *In re Allied Repair Serv., Inc.*, B–207629, 62 Comp. Gen. 100, 102 (Dec. 16, 1982) ("The Department of Defense (DOD) acts as an agent for a foreign government when it conducts procurements under the au-

eral references to the United States Government acting "as the [procurement] agent of the buying customer in dealing with the United States selling company," and cited a House Report stating that "the moneys are not Government moneys, and in no way enter into the fiscal program of the Government"; however, the holding of the opinion was merely that the FMS Trust Fund monies are appropriated funds. Moreover, even if the United States Government is "in effect" an agent for a foreign government in some sense in the FMS program, this circumstance does not change the fact that funds in the FMS Trust Fund are in the United States Treasury, nor does it mean that a claim for payment from the United States cannot form the basis of an actionable FCA action in the FMS context. *Cf. In re Israel Aircraft Indus., Ltd.*, B–258229, 94–2 Comp. Gen. Proc. Dec. ¶ 262, 1994 WL 725559, at *4 (Dec. 28, 1994) ("[T]he protester's characterization of the government's involvement in this procurement as that of a transfer agent, rather than a purchaser, does not alter the governmental purpose that the FMS procurement would serve.... [T]he U.S. Government's role as defined by the Executive Order [regarding administration of the Arms Export Control

Act] is greater than that of a conduit, and continued involvement of the government demonstrates that the procurement is intended to serve a governmental purpose."). Indeed, it has been held, in the income tax context, that funds in the FMS Trust fund "vest[ ] in the United States Government upon deposit therein" and that payments from that fund are payments from the United States rather than from the depositing foreign country. *Soboleski v. Commissioner of Internal Revenue*, 88 T.C. 1024, 1987 WL 49312 (U.S.Tax Ct.1987) (noting that "the controlling facts on this issue are not who bears the ultimate economic burden of paying the taxpayer's salary" and that "[t]he United States cannot be considered a mere agent or paymaster acting on behalf of Saudi Arabia when it alone was obligated to compensate" the taxpayer). Thus, notwithstanding the statements of the Comptroller General, the funds are plainly within the U.S. Treasury.

 Lockheed also relies on the text of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, under which the Foreign Military Sales program is administered, contending that the requirement in that statute that FMS result in "no loss" to the Government precludes liability of Lockheed under the FCA.[11] Lockheed as-

---

thority of the Arms Export Control Act, using the foreign government's funds that have been deposited in the Foreign Military Sales Trust Fund Account in the Treasury. While the funds are appropriated in a technical sense, they are administered by the United States in the capacity of a trustee; by law, these funds can only be disbursed in compliance with the terms of the trust.").

11. The AECA states in part as follows:

(a) Authority of President; dependable undertaking by foreign country or international organization; interest rates

Except as otherwise provided in this section, the President may, without requirement for charge to any appropriation or contract authorization otherwise provided, enter into contracts for the procurement of

defense articles or defense services for sale for United States dollars to any foreign country or international organization if such country or international organization provides the United States Government with a dependable undertaking (1) to pay the full amount of such contract **which will assure the United States Government against any loss on the contract**, and (2) to make funds available in such amounts and at such times as may be required to meet the payments required by the contract, and any damages and costs that may accrue from the cancellation of any net amount by which any such country or international organization is in arrears under all of the outstanding unliquidated dependable undertakings, considered collectively....

22 U.S.C. § 2762(a) (emphasis added).

serts that because "no loss" can result to the Government under the FMS program, there is no risk of loss to the United States Treasury from any false invoices Lockheed submitted to the Government where FMS funds were ultimately to be used to pay Lockheed's invoices. However, the Court is unpersuaded.

The existence of the "no loss" provision in a separate statute, the AECA, does not insulate Lockheed from FCA liability. The fact that the Government might, by some unrelated means, ultimately be protected against loss does not mean that no claim is made against the U.S. Treasury in the first instance. *Cf. Bly–Magee v. California,* 236 F.3d 1014, 1017 (9th Cir.2001) ("If Bly–Magee proved her claim of theft, the resulting damages initially would go to the federal government even if the federal government would then be obligated to reallocate those funds to another state. We conclude that even if the government ultimately reallocates recovered funds, a qui tam plaintiff need not prove that the federal government will suffer monetary harm to state a claim under the FCA."). Moreover, Lockheed's reliance on the "ultimate" source of the funds for payment is merely an attempt to have this Court delve into irrelevant levels of accounting. *Cf. United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) ("Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states.... These funds are as much in need of protection from fraudulent claims as any other federal money, and the statute does not make the extent of their safeguard dependent on the bookkeeping devices used for their distribution.").

The Government is an independent actor and not a true "fiduciary" or "agent" of a foreign government in the Foreign Military Sales program. Under the AECA, the President (and by designation, the Department of Defense) may sell defense articles and services from two sources: (1) from the stocks of the Department of Defense, and (2) procured items. "Because the Department of Defense obviously does not keep spare F–16 aircraft or LANTIRN pods in stock, Congress authorized the President to procure items for the United States for resale to foreign nations." (Doc. 417 at 4). Regardless of whether the sales are stock sales or procured item sales, it is the United States who is selling the items to the foreign governments.

In this arrangement there is no privity of contract between Lockheed and the foreign countries. Instead, Lockheed was obligated to deliver LANTIRN pods to the United States and the United States was obligated to pay Lockheed for the pods; the Government's obligation to pay was not contingent on receipt of funds from a foreign government. The foreign nations have no obligation to pay Lockheed, and the United States actually takes title to the LANTIRN pods upon delivery from Lockheed, and title then passes from the United States to the foreign government. The United States is benefitting its own foreign policy interests when it undertakes the sale of military equipment under the FMS program, and the United States has the option of refusing to resell to the foreign government even if an LOA exists. It is important to note that Lockheed could have contracted directly with the foreign governments in a direct commercial sale, but instead Lockheed opted to use the FMS program, one of the benefits of which is the assurance of payment by the United States Government.

Finally, in construing the FCA it is important to keep in mind the history and purpose of the statute. As the Supreme Court noted in *United States v. McNinch,*

356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958):

> The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury.

(Citations omitted). The context of the instant case fits squarely within the intent of Congress to protect the United States Government—although now the Department of Defense rather than the "War Department"—from price gouging in the procurement of defense materials. The fact that the materials were ultimately going to be *resold* to foreign countries under the FMS program—a program provided for in a totally separate statute—does not render the FCA any less applicable to the transaction between Lockheed and the United States. Thus, although the *McNinch* Court also noted that "the False Claims Act was not designed to reach every kind of fraud practiced on the Government," 356 U.S. at 599, 78 S.Ct. 950, the fraud alleged in this case is precisely the type of fraud that Congress intended to cover, and Lockheed cannot escape FCA liability based on the mere fortuity that these pods were later to be resold by the United States to foreign countries through an entirely separate transaction.

Accordingly, Lockheed's Motion for Summary Judgment on FMS Issues (Doc. 376) shall be denied.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The United States' Motion for Partial Summary Judgment (Doc. 369) is **GRANTED in part** and **DENIED in part** as set forth herein.

2. Defendants' Motion for Summary Judgment on Counts II–VII of the Government's Complaint (Doc. 374) is **DENIED** except to the extent that it has been granted as to Counts VI and VII by prior Order.

3. Defendants' Motion for Summary Judgment on FMS Issues (Doc. 376) is **DENIED**.