# United States Court of Appeals for the Federal Circuit

05-5018

FLEXFAB, L.L.C.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

John W. Allen, Varnum, Riddering, Schmidt & Howlett, LLP, of Grand Rapids, Michigan, argued for plaintiff-appellant. With him on the brief was Perrin Rynders. Of counsel was Cynthia W. Warren.

Claudia Burke, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Lawrence J. Block

# United States Court of Appeals for the Federal Circuit

05-5018

FLEXFAB, L.L.C.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  September 27, 2005

_____

Before CLEVENGER, BRYSON, and PROST, <u>Circuit Judges</u>.

CLEVENGER, <u>Circuit Judge</u>.

Plaintiff-appellant Flexfab, L.L.C. ("Flexfab") appeals the ruling of the United States Court of Federal Claims on cross-motions for summary judgment that Flexfab was not an intended third-party beneficiary of a contract between Capital City Pipes, Inc. ("Capital City"), a now-insolvent contractor, and The Defense Logistics Agency, Defense Supply Center Columbus ("DSCC" or "government"), or in the alternative that Flexfab was not a direct party to an implied-in-fact contract with the government.  <u>See</u> <u>Flexfab, LLC v. United States</u>, 62 Fed. Cl. 139 (2004).  Because the record is absent evidence that a government agent with authority to contract on behalf of the government intended to benefit Flexfab in the contract between Capital City and DSCC, or to contract with Flexfab directly, we affirm.

I

Congress passed the Small Business Act of 1953, 15 U.S.C. §§ 631-651, to "aid, counsel, assist, and protect . . . the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises." 15 U.S.C. § 631(a) (2000). In section 8(a) of the Act, 15 U.S.C. § 637(a), Congress delegated to the Small Business Administration ("SBA") the authority to "enter into contracts with any procurement agency of the Federal Government to furnish required goods or services, and, in turn, to enter into subcontracts with small businesses for the performance of such contracts." Fullilove v. Klutznick, 448 U.S. 448, 463 (1980); see also 15 U.S.C. § 631(f)(2) (explaining the purposes of section 637(a)). In accordance with this statutory mandate, the SBA in 1968 developed a program "to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1 (2005). See generally 13 C.F.R. § 124.1-.603 (2005) (implementing section 8(a) programs). It is within the context of the SBA's section 8(a) program that the present case arises.

A

Michael Taylor was one of five DSCC small business specialists responsible for reviewing government contract solicitations above $10,000 to determine whether the work solicited could be completed by an SBA-approved section 8(a) contractor. If the contract solicitation is placed in the section 8(a) program, bidding on the solicitation is generally limited to participating businesses—i.e., those businesses "unconditionally

owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrate[ ] potential for success."  13 C.F.R. § 124.101.

Prior to 1998, C&S Industrial Supply Co. ("C&S") was DSCC's section 8(a) program supplier of air-duct hose.  In 1998, however, C&S "graduated" from the program.  See id. § 124.2 ("A firm that completes its nine year term of participation in the 8(a) BD program is deemed to graduate from the program.").  Upon the recommendation of Henry Cook, Chief Executive Officer of C&S, Mr. Taylor arranged for the approval of Capital City to participate in the section 8(a) program.  Capital City thereafter became DSCC's new supplier of air-duct hose.

In 1999, Anita Luich, a DSCC pre-award contracting officer, contacted Capital City about the procurement of air-duct hose.  Capital City in turn approached Flexfab about manufacturing the hose.  Flexfab refused to deal directly with Capital City, however, and instead offered to supply hose to Capital City through C&S.  Mr. Cook claims to have informed Mr. Taylor at this point that Flexfab would not enter into the proposed arrangement unless the government agreed to pay Flexfab directly through an escrow account.  According to Mr. Cook, Mr. Taylor promised to contact Capital City to ensure that any contract provided for the means for payment requested by Flexfab.  There is no evidence of record, however, that Mr. Taylor himself had authority to execute contracts on behalf of DSCC or that he communicated directly with an authorized contracting officer or any representative of an authorized contracting officer.

Ms. Luich ultimately prepared an initial draft of a section 8(a) program contract between Capital City and the government for the provision of air-duct hose. As originally drafted, the contract listed the following remittance address:

Capital City Pipes, Inc.
P.O. Box 12368
Tallahassee, FL  32317

By incorporating the provisions of 48 C.F.R. § 52.232-33, the contract also allowed for payment at the option of the government through an electronic fund transfer ("EFT"). See 48 C.F.R. § 52.232-33(a) (1998) ("Payments by the Government under this contract, including invoice and contract financing payments, may be made by check or [EFT] at the option of the Government."). Capital City initially registered its own EFT information in DSCC's Central Contractor Registration ("CCR") database. Despite a modification to the remittance address in the contract, as discussed infra, Capital City never updated the CCR database with new EFT information. The incorporated regulation made it Capital City's responsibility to do so. See id. § 52.232-33(c) ("In the event that the EFT information changes, the Contractor shall be responsible for providing the changed information to the designated payment office(s).").

B

On June 23, 1999, Capital City requested by letter that the remittance address listed in the contract be changed to:

Capital City Pipes, Inc
C/O ABA #07200052
Old Kent Bank Corp Trust
P.O. Box 144
Grand Rapids, MI 49501-0144

The letter was incorporated into the contract. On June 29, 1999, DSCC formally awarded Contract No. SPO740-99-C-1004 to Capital City for payment in exchange for the supply of air-duct hose. As a supplier without manufacturing capabilities, Capital City entered into a sub-contract with C&S, which in turn entered into a sub-contract with Flexfab for production of the hose.

After several conversations between Mr. Taylor and Mr. Cook purportedly aimed at securing Flexfab's payment under the contract, Capital City requested in a July 1, 1999, letter to Ms. Luich that DSCC make two changes to the June 29 contract:

The adjustments are 1st the remittance address
Capital City Pipes, Inc
C/O ABA #07200052
Old Kent Bank Corp Trust
P.O. Box 144
Grand Rapids, MI 49501-0144

2nd Adjustment
Place of Performance, Place of Shipping & Inspection should read:
Flexfab, Division
8143 Gun Lake Road
Hastings, MI

On September 27, 1999, Malinda Jeffries, a DSCC post-award contracting officer, issued the following modification in an Amendment of Solicitation/Modification of Contract form:

The remittance address where cited throughout the contract is hereby corrected to read as follows:

Old Kent Bank, Corp Trust
CO# ABA# 07200052
P.O. Box 144
Grand Rapids, MI 49501-0144

The record is void of evidence that Ms. Jeffries knew that the modification to the contract was in any way associated with Flexfab's escrow account. The record reflects

that neither Mr. Cook, nor Mr. Taylor, nor any Flexfab personnel ever communicated with the contracting officers to explain and memorialize the alleged demand by Flexfab that it would perform only if paid directly by the government into an escrow account for its benefit. In short, Flexfab relied entirely on others, mainly Capital City, to assure that Flexfab, not Capital City, would receive direct payment for the delivered hose.

Flexfab thereafter delivered air-duct hose to DSCC on several occasions. After each delivery, Defense Finance and Accounting Services ("DFAS") paid Capital City electronically, using Capital City's EFT information listed in the CCR database. DFAS ultimately paid Capital City the full amount due under the contract. Capital City later became insolvent and never paid Flexfab. On August 25, 2000, Flexfab demanded payment of $452,031.60 from DSCC for the delivered air-duct hose. DSCC denied the request. Flexfab thus brought suit in the Court of Federal Claims, claiming that it was owed the money as an intended third-party beneficiary to the contract between Capital City and DSCC or, in the alternative, as a direct party to an implied-in-fact contract between it and DSCC.

C

Turning its attention first to Flexfab's third-party beneficiary theory, the Court of Federal Claims stated that "unless Flexfab can make a sufficient showing that DSCC intended to benefit Flexfab, in other words, that some government agent possessing authority to bind the government agreed to make Flexfab a payee under the Contract, the government is entitled to judgment as a matter of law." Flexfab, 62 Fed. Cl. at 149 (internal quotation marks omitted). Finding that Flexfab made no such showing, the court held that "Flexfab's third-party beneficiary claim here falls short because Flexfab

has failed to present any evidence that a government employee with actual authority intended to benefit Flexfab through the Capital City contract." Id. at 150. Turning next to the implied-in-fact contract theory, the Court of Federal Claims stated that "Flexfab has failed to present evidence related to two essential elements of its implied contract claim: (1) mutual intent to contract; and (2) actual authority to contract on the part of the relevant government agents." Id. at 151.

Ruling on cross-motions for summary judgment, the Court of Federal Claims granted judgment in favor of the government. Flexfab appeals. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

II

Summary judgment is appropriate when examined in a light most favorable to the non-movant, the record indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." R. Ct. Fed. Cl. 56(c); see also Fed. R. Civ. P. 56(c) (same). We review the Court of Federal Claims's decision granting summary judgment de novo, drawing all justifiable factual inferences in favor of Flexfab. Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004). The underlying question of whether Flexfab was a third-party beneficiary under the contract is a mixed question of law and fact. Glass v. United States, 258 F.3d 1349, 1353 (Fed. Cir. 2001). The existence of an implied-in-fact contract between Flexfab and the government is a question of fact. Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403, 408 (Fed. Cir. 1996).

05-5018                                                    7

III

Though not expressly stated as such, the determination by the Court of Federal Claims that Flexfab was not an intended third-party beneficiary raises a serious issue of standing on which the court properly focused prior to and independent of the particular merits of the case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998) (referring to the issue of standing as a "threshold jurisdictional question"); Warth v. Seldin, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). Because Flexfab was not a direct party to the contract between Capital City and DSCC, it has standing to enforce the contract only if it was an intended third-party beneficiary. See Castle v. United States, 301 F.3d 1328, 1339 (Fed. Cir. 2002) (finding that plaintiffs were "at most incidental beneficiaries" and as such "lacked standing to sue for breach of the alleged contract"). We therefore focus first, as did the Court of Federal Claims, on the issue of whether Flexfab has standing, as an intended third-party beneficiary of the contract between Capital City and DSCC, to enforce the agreement. We find that the governing legal principles compel judgment in the government's favor.

A

"In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." Glass, 258 F.3d at 1354; see also Caguas Cent. Fed. Sav. Bank v. United States, 215 F.3d 1304, 1309 (Fed. Cir. 2000) ("The contract must reflect the express or implied intention of the parties to benefit the third party." (quotation omitted)); 13 Williston on Contracts § 37:8 (4th ed.

2000). The intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status.

Proof of the requisite intent is no small matter, for the Supreme Court has recognized the exceptional privilege that third-party beneficiary status imparts. See German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit."). The privilege should not be granted liberally.

"Exceptional" though it may be, third-party beneficiary status is not reserved for those parties who benefit expressly under a given contract. We note, too, that "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997). Evidence of intent can be adduced. Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001). In short, it is sufficient to ask in the typical case "whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." Montana, 124 F.3d at 1273 (citing Restatement (Second) of Contracts § 302(1)(b) cmt. d.).

B

Though a third-party beneficiary of a contract to which the government is a direct party may assert a claim against the government in accordance with the rules applicable to third-party claims, the law governing third-party beneficiaries is subject to the principle that the government can only be bound by those with authorization to do so. See Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997)

("A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States."); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) ("the Government representative whose conduct is relied upon must have actual authority to bind the government in contract" (internal quotation marks omitted)).

The Supreme Court has warned of the associated risks in dealing with a government agent:

> [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). The Supreme Court's admonition in Federal Crop Insurance is firmly grounded in the public policy goal of protecting the public treasury from depletion by claims brought pursuant to unauthorized government contracts. The United States government employs millions of civilian employees. "Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obliging the United States." City of El Centro, 922 F.2d at 820.

A party seeking to enter into an agreement with the government can abate the risk by taking particular care to insure that it negotiates with a government agent whose status is that of a "contracting officer." See 48 C.F.R. § 2.101 (2004) ("Contracting officer means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings."). A contracting officer is a

government agent vested with the authority to enter into and sign contracts on behalf of the government. See 48 C.F.R. § 1.601 (2004) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."); John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 80 (3d ed. 1998) ("Contracting officers have the sole authority to legally bind the Government to contracts and contract modifications."). Given that authority, the contracting officer also has the additional authority to modify contracts. See Gene Peters v. United States, 694 F.2d 687, 693 (Fed. Cir. 1982) (stating that the delegation of authority to enter into contracts "necessarily and inherently includes the authority to enter into modification of them as well"). The contracting officer is thus the authorized face of the government at the contract formation table.[1]

C

Flexfab is not unfamiliar with the aforementioned law applicable to third-party beneficiary status and government contracts. Indeed, it previously filed suit against the government in the Court of Federal Claims on facts similar to those at issue in this case, alleging both direct contract and third-party beneficiary theories. See Flexfab, Inc. v. United States, No. 94-974 (Fed. Cl. Feb. 8, 1996) ("1996 Flexfab Decision"). We find the court's decision in that case instructive of how we should approach third-party beneficiary claims where the knowledge and intent of those with authority to contract on the government's behalf are at issue. The facts of that case are thus relevant, we think, to the question now before us.

---

[1] In referring to the "contracting officer" throughout, we include, of course, any person authorized to represent the contracting officer in the process of negotiation, formation, and modification of the contract.

Flexfab became a subcontractor to Gladen Industries, Inc. ("Gladen") in 1991. Id. at 2. Under the subcontract, Flexfab supplied Gladen with vehicle parts necessary for the performance of Gladen's obligations under three government contracts between Gladen and the Defense Construction Supply Center ("DCSC"). Pursuant to the three prime contracts, Gladen was to supply aircraft and submarine parts to DCSC for use in Operation Desert Storm. Gladen soon became late in making payments to Flexfab, and Flexfab responded by refusing to ship additional parts to Gladen until Flexfab received a guarantee of payment. Gladen subsequently fell behind in its deliveries to DCSC.

Flexfab, Gladen and the government thereafter engaged in extensive negotiations to resolve the standstill in a mutually beneficial manner. Flexfab initially requested that it be designated the "payee" under the contract. DCSC refused because formal assignment of Gladen's contract rights would require the government to re-bid the contract, a time-consuming procedure thought not feasible during wartime. Acting on a suggestion from Jeffrey Weiden, Flexfab's Treasurer, DCSC instead agreed to modify the prime contracts to designate Flexfab as the "mailee" for all future payments. Gladen provided Flexfab the authority to endorse the checks Flexfab received from DCSC, and Flexfab agreed to deliver all remaining shipments directly to DCSC.

While acceptable to Flexfab in theory, the arrangement quickly soured in practice. DCSC accepted the shipments from Flexfab but mailed checks to Gladen. Before Flexfab could recover from Gladen the total amount due for the shipments, Gladen filed for bankruptcy. Flexfab sued in the Court of Federal Claims to recover directly from DCSC the difference between the amount DCSC paid Gladen under the contract and the amount Flexfab recovered from Gladen prior to the bankruptcy filing.

In support of its motion for summary judgment, Flexfab presented evidence of the participation of Mrs. A.J. Turner in the three-way negotiations between Flexfab, Gladen and DCSC. Mrs. Turner was a government contracting specialist with authority to negotiate agreements on the government's behalf. According to an affidavit of the Flexfab Accounts Receivable Clerk in charge of Flexfab's subcontract with Gladen, "Gladen, Flexfab, and the Government . . . entered into a series of discussions and negotiations . . . . [A]s negotiations became more serious, . . . Mrs. A.J. Turner became more involved." 1996 Flexfab Decision at 7 (quoting Tebo Aff. ¶ 9). Mr. Widen stated by affidavit that "Mrs. Turner confirmed that my suggestion was acceptable to the Government and that this solution would take care of my concerns about payment on these contracts." Id. at 9 (quoting Weiden Aff. ¶ 8). Flexfab's Accounts Receivable Clerk also testified that upon receiving an endorsement stamp and with it the authority to endorse checks made payable to Gladen, he "informed Mrs. Turner at the DCSC via facsimile . . . that Flexfab had received the endorsement stamp and was ready to proceed on the contracts as soon as the contract modifications were enacted." Id. (quoting Tebo Aff. ¶ 12). The Court of Federal Claims was particularly moved by a facsimile from Flexfab to Mrs. Turner sent together with an accompanying copy of the letter of agreement between Flexfab and Gladen. The court stated that the evidence "demonstrates beyond peradventure that DCSC contract officials were aware of the payment arrangement between plaintiff and Gladen and that plaintiff would ship parts when the contracts had been modified to designate plaintiff as the 'mailee' for payment." Id. at 11.

The Court of Federal Claims thus found dispositive evidence that the contracting officer knew of the payment arrangement between Flexfab and Gladen and intentionally modified the contract to designate Flexfab as the "mailee" so as to spur the continued shipment of parts. The court concluded that "the evidence clearly demonstrates that the contract modifications were intended to benefit plaintiff" and granted summary judgment in favor of Flexfab for that reason. Id. at 12-13.

D

Flexfab now argues on appeal from the Court of Federal Claims's decision in this case that Mr. Taylor's admitted lack of authority to oblige the government in contract is not relevant because the parties do not dispute that the contract between Capital City and DSCC was itself authorized by the government. Flexfab further contends that Mr. Taylor's knowledge that the escrow account specified in the contract modification was set up by and for Flexfab and that the remittance instructions in the original contract and contract modification were intended to ensure payment to Flexfab is sufficient to make Flexfab an intended third-party beneficiary under the contract.

Flexfab's argument is misplaced. Though we previously have held that the modification of a remittance clause to give a subcontractor control over payments from the government qualifies the subcontractor as an intended third-party beneficiary, that rule of law is subject to the principle that only those with authority to contract on the government's behalf can exhibit the necessary intent to give the subcontractor such control. See D & H Distrib. Co. v. United States, 102 F.3d 542, 544, 546-47 (Fed. Cir. 1996) (finding a subcontractor to be an intended third-party beneficiary where the contracting officer approved of an arrangement to make the subcontractor a joint payee

05-5018                          14

under the contract). Such intent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party. The formation and modification of a government contract may very well involve many government personnel bearing titles such as contract specialist, contract negotiator, cost analyst, project manager, engineer, auditor, attorney, and, as is the case here, small business specialist. Cibinic, Jr. & Nash, Jr., supra, at 80. But the knowledge of these persons generally, and that of Mr. Taylor here, is not relevant. It is instead the contracting officer's understanding of the situation that is key.

We thus hold that for third-party beneficiary status to lie, the contracting officer must be put on notice, by either the contract language or the attendant circumstances, of the relationship between the prime contractor and the third-party subcontractor so that an intent to benefit the third party is fairly attributable to the contracting officer. Borrowing from the Court of Federal Claims's 1996 Flexfab Decision, we agree with the proposition that when a government agent with authority to contract on the government's behalf knows of a condition precedent to a third party's performance as a sub-contractor, such as receipt of payment directly from the government, and specifically modifies the prime contract so as to ensure the third party's continued performance, the agent and by implication the government itself necessarily intend to benefit the third party. That intent gives rise to standing as a third-party beneficiary to enforce the prime contract.

05-5018                                    15

In holding as we do, we are mindful of the black letter law that the United States as a sovereign may not be sued unless it consents. See United States v. Lee, 106 U.S. 196, 207 (1882). As a general rule, the "government consents to be sued only by those with whom it has privity of contract." Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984); Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity."). As a result, a subcontractor generally cannot bring a direct appeal against the government. The rule, however, is not without exceptions. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1551 (Fed. Cir. 1983). One such exception allows suit against the government by an intended third-party beneficiary despite the lack of privity. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999). But the government does not lightly consent to suit. Surely the assurances from a government agent, having no authority to give them, cannot expose the government to risk of suit for the nonperformance of an obligation that it did not intentionally accept. We thus are careful not to open the courthouse doors to those falling victim to the statements of unauthorized government agents, lest we broaden improperly the government's waiver of immunity from suit in these cases. See Chancellor Manor v. United States, 331 F.3d 891, 898 (Fed. Cir. 2003) ("Waivers of sovereign immunity are construed narrowly.").

We note, too, that the rule set forth today takes on particular import in the class of cases to which this one belongs—those arising from the SBA's section 8(a) program.[2]

---

[2] This is not the first case referencing allegations of the failure by a section 8(a) program contractor to pay a subcontractor. See Arthur Pew Constr. Co., Inc. v. Lipscomb, 965 F.2d 1559, 1567 (11th Cir. 1992); ATC Petroleum, Inc. v. Sanders, 860

The section 8(a) program, as previously discussed, was designed to assist minority-owned businesses. See Cibinic, Jr. & Nash, Jr., supra, at 1428. Those businesses must qualify for participation and must comply with certain legal requirements.[3] By requiring an authorized government contracting officer to be engaged in the creation of enforceable obligations under these section 8(a) contracts, we better equip the government to insure that contracting parties comply with the regulations pertaining to their participation in the program. The policies promoted by the section 8(a) program are achieved by proper compliance with all program requirements. Transparency in dealings among section 8(a) contractors, their suppliers and the government contracting authorities will avoid the kind of misunderstandings that produced this case.

---

F.2d 1104, 1115 (D.C. Cir. 1988); U.S. for Use & Benefit of Fred's Plumbing & Heating, Inc. v. Small Bus. Admin., 807 F. Supp. 675 (D. Colo. 1992); JGB Enters., Inc. v. United States, 63 Fed. Cl. 319 (2004); FloorPro, Inc., ASBCA No. 54143 (Mar. 30, 2004); Foremost Solutions, Inc., IBCA Nos. 4520 and 4521 (Sept. 8, 2004).

[3] For example, to advantage itself of the benefits of the program, a section 8(a) program contractor, both now and at the time the section 8(a) contract was awarded in the present case, "must perform certain percentages of work with its own employees." 13 C.F.R. § 124.510(a) (2005). "In the case of a contract for supplies or products (other than procurement from a non-manufacturer in such supplies or products), the concern will perform at least 50 percent of the cost of manufacturing the supplies or products (not including the costs of materials)." 13 C.F.R. § 125.6(a)(2) (2005). In the case of a non-manufacturer, such as Capital City, the section 8(a) program contractor must "supply the end item of a small business manufacturer or processor made in the United States," unless it obtains a waiver of the requirement. 13 C.F.R. § 121.406(b)(1)(iii) (2005).

Flexfab apparently delivered all of the air-duct hose required under a contract awarded to Capital City for the supply of the hose. The record does not indicate whether Flexfab itself was a small business such as would satisfy the non-manufacturer rule. At least one legal commentator has surmised wrongdoing. See 19 No. 4 Nash & Cibinic Rep. 19 (2005) (concluding that the section 8(a) contractor in Flexfab was merely a "front" and that the contractor/subcontractor arrangement was in violation of the small business policies underlying the program). However, the issue of proper compliance with the requirements of the section 8(a) program in the contract in suit is not before us. We thus express no opinion on that issue.

05-5018                                        17

With the rule of law in hand, we now turn to the facts of the present case. Neither the contract nor the modification shows intent by the contracting officers to benefit Flexfab by linking in any way the remittance address to Flexfab. Looking beyond the contract itself, Flexfab can point to no evidence of record that establishes such intent. Indeed, the evidence is to the contrary. Ms. Luich, the pre-award contracting officer, testified that she had no knowledge of an agreement regarding an escrow arrangement between Capital City and Flexfab. (Joint App. at 122.) Ms. Jeffries, the post-award contracting officer, testified that she did not know why Capital City requested the contract modification. Furthermore, there is no evidence that anyone from Flexfab spoke directly to the contracting officers about Flexfab's desire to be paid directly by the government, nor is there any evidence that Mr. Taylor communicated this desire to the contracting officers. Flexfab apparently trusted Capital City to assure that Flexfab got paid for the goods it delivered. We thus agree with the Court of Federal Claims that the "contracting officers, the only individuals involved with authority to contract on behalf of the government, could not have intended to benefit Flexfab because they had no knowledge of the purpose of the remittance address in both the Contract and the Modification." Flexfab, 62 Fed. Cl. at 148-49.

For the reasons expressed in this opinion, we conclude that without a sufficient evidentiary showing by Flexfab of intent on the part of the contracting officers and thus the government itself to benefit Flexfab directly, it cannot establish standing to enforce the contract between Capital City and DSCC as a third-party beneficiary. In the future, Flexfab and other subcontractors would do well to heed the advice of leading commentators on the issue: "Never—never—never rely on other Government

employees such as small business specialists to arrange these transactions." 19 No. 4 Nash & Cibinic Rep. 19 (2005). Otherwise, a subcontractor may very well realize to its detriment "the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop Ins., 332 U.S. at 384.

IV

Flexfab's alternate theory that a binding implied-in-fact contract existed between it and the government fails for the same reason. Flexfab must show (1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government. Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc). Flexfab therefore must prove that one with authority to bind the government intended to do so by contracting directly with Flexfab. Having failed on this point, Flexfab cannot prevail under a direct contract theory.

V

Because Flexfab did not present evidence sufficient to create a question of fact that it was an intended third-party beneficiary of the contract between Capital City and DSCC or that it had an implied-in-fact contract with the government, it has no standing to sue under either theory. We thus affirm the decision of the Court of Federal Claims.

AFFIRMED