PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SECRETARY OF STATE FOR DEFENCE, as
represented by the United Kingdom
Ministry of Defence, Defence
Procurement Agency,
          *Plaintiff-Appellant,*

          v.

TRIMBLE NAVIGATION LIMITED,
          *Defendant-Appellee.*

No. 06-1062

UNITED STATES OF AMERICA,
          *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:03-cv-966-GBL)

Argued: January 31, 2007

Decided: May 10, 2007

Before WIDENER, TRAXLER, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the majority
opinion, in which Judge Widener joined. Judge Traxler wrote a dis-
senting opinion.

## COUNSEL

**ARGUED:** Mark Douglas Colley, HOLLAND & KNIGHT, Wash-
ington, D.C., for Appellant. Alan Arnold Pemberton, COVINGTON

& BURLING, Washington, D.C., for Appellee. Thomas Mark Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Civil Division, Appellate Section, Washington, D.C., for Amicus Supporting Appellee. **ON BRIEF:** Richard O. Duvall, Jennifer A. Short, David B. Dempsey, Eric L. Yeo, HOLLAND & KNIGHT, McLean, Virginia, for Appellant. Eugene D. Gulland, Derron J. Blakely, COVINGTON & BURLING, Washington, D.C., for Appellee. Peter D. Keisler, Assistant Attorney General, Chuck Rosenberg, United States Attorney, Douglas N. Letter, Sushma Soni, UNITED STATES DEPARTMENT OF JUSTICE, Civil Division, Appellate Section, Washington, D.C., for Amicus Supporting Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

The question before the Court is whether a foreign government is a third-party beneficiary of a contract for military goods between the United States and a domestic military contractor, where the foreign government agreed to purchase those goods from the United States under the Foreign Military Sales program. Because affording the foreign purchaser such extraordinary third-party beneficiary rights is contrary to the structure and intent of the Foreign Military Sales program, we affirm the district court's dismissal of the foreign government's complaint.

I.

We recounted the facts of this case in an earlier decision involving this dispute. *See U.K. Ministry of Defence v. Trimble Navigation Ltd.* (*Trimble I*), 422 F.3d 165 (4th Cir. 2005) (holding that Contract Disputes Act of 1978 did not apply to suit by foreign purchaser against domestic contractor).

A.

The Arms Export Control Act ("AECA") controls the sale of military goods and services to foreign governments. *See* 22 U.S.C.

§§ 2751-2796d (2000). There are two primary methods through which a foreign government may purchase military equipment manufactured by U.S. contractors: Direct Commercial Sales ("DCS") and Foreign Military Sales ("FMS"). DCS transactions are effectuated via a direct contract between the foreign government and a domestic contractor. In an FMS transaction, the United States and the foreign government purchaser enter into a contract for the goods, which the United States then provides from its own inventory or purchases from a domestic contractor through a separate agreement. An FMS purchase involves two contracts: one between the foreign government and the United States, termed the Letter of Agreement ("LOA"), and one between the United States and the domestic contractor. The United States allows friendly foreign governments to purchase most items through either FMS or DCS and is generally neutral regarding the choice between the two methods. *See* Def. Sec. Cooperation Agency, U.S. Dep't of Def., *Security Assistance Management Manual*, DoD 5195.38-M, ("*SAMM*") §§ C4.5.8, C4.5.9.1, at 111.[1] Some items, however, because of their sensitive nature can only be purchased through the FMS program. *See, e.g.*, *id.* § C.4.5.9. The items at issue in this case are FMS-only items. *See Trimble I*, 422 F.3d at 167.

This case involves auxiliary output chips ("AOCs") manufactured by Trimble Navigation Limited ("Trimble") for use in certain global positioning satellite ("GPS") devices. These GPS devices work by accessing a satellite network deployed by the United States. The United Kingdom, as represented by the United Kingdom Ministry of Defence ("UK MOD"), along with other members of the North Atlantic Treaty Organization, entered into a Memorandum of Understanding ("MOU") with the United States allowing them to use the GPS

---

[1]Any security assistance activities, including FMS transactions, must be in compliance with the *Security Assistance Management Manual*. *See SAMM*, *supra*, § C1.2.4.1. While implementing agencies may supplement the *SAMM*, "[s]upplements must be consistent with th[e] Manual." *Id.* The *SAMM* is issued under the authority of Department of Defense ("DoD") directive 5105.65. *Id.* at 2. DoD 5105.65 § 5.8 established the Defense Security Cooperation Agency ("DSCA") and authorized the DSCA to develop and promulgate the *SAMM*. The President delegated authority under the AECA to the DoD via executive order. *See* Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977).

satellite network. The MOU required those governments "to buy certain GPS-related equipment, including the auxiliary output chips at issue here, through the [FMS] Program and a[n] [LOA.]" *Trimble I*, 422 F.3d at 167. Accordingly, UK MOD and the United States entered into an LOA in July 1998, whereby the United States agreed to furnish AOCs manufactured by Trimble. *Id.* at 167. The United States then entered into four contracts with Trimble for production and delivery of the AOCs (the "U.S.-Trimble agreements" or "U.S.-Trimble contracts"); by the terms of the FMS program, UK MOD was not a party to these contracts. *Id.*

B.

The U.S.-Trimble contracts incorporate standard federal acquisition regulation clauses on terms related to shipping, disputes, termination for convenience, pricing, and the like. *See, e.g.*, J.A. 35, 39-40. Although UK MOD was not a party to the contract, the contract specifies the UK MOD FMS case number and provides for direct delivery to a freight forwarding service for shipment to a United Kingdom address. *See, e.g.*, J.A. 33-34. The U.S.-Trimble contracts do not specify that Trimble would be producing AOCs for any party in addition to UK MOD—such as for the United States' inventory stock—and the contracts do not contain an express disclaimer of any third-party beneficiary rights of UK MOD.

The LOA between UK MOD and the United States was based on the standard LOA model used in the FMS program. *See SAMM*, *supra*, at 138-42 fig.C5.F3 (setting forth LOA standard terms and conditions). Section 1.2 of the LOA provides that the United States could sell UK MOD AOCs out of its inventory stock or "procure them under terms and conditions consistent with D[o]D regulations and procedures." J.A. 132. If an LOA is fulfilled through procurement, the acquisition procedures will be in accordance with normal DoD regulations, thus "afford[ing] the foreign purchaser the same benefits and protection that apply to DoD procurement." *SAMM*, *supra*, § C.6.3.1. Section 1.2 of the LOA also provides that the United States is "solely responsible for negotiating the terms and conditions of contracts necessary to fulfill the requirements [of the] LOA." J.A. 132. Section 1.4 allows the United States to terminate or take other

action with respect to the contracts between the United States and its suppliers without these actions affecting the LOA. J.A. 132.

Section 5 of the LOA addresses transportation and delivery logistics. Section 5.4 provides that deficiencies in the items covered by the LOA must be reported through the Supply Discrepancy Report ("SDR") process. J.A. 134; *SAMM*, *supra*, § C.6.4.10. These discrepancies include discrepancies caused by the manufacturer, such as "defects or nonconforming conditions, which limit or prohibit the item from fulfilling its intended purposes," whether from faulty materials, manufacturing, or workmanship, and include situations in which the United States has not acted erroneously. Defense Institute of Security Assistance Management, *Online Green Book: The Management of Security Assistance* ("*Green Book*") 10-34, http://disam.osd.mil/pubs/DR/greenbook.htm; *see SAMM*, *supra*, § C6.4.10.3.[2]

Section 6 of the LOA addresses warranties and notes that, except for warranty of title, the items received by UK MOD under the LOA would carry no additional warranties unless specifically requested by UK MOD. The *Green Book* explains that the customer is not without recourse, however, "if an item . . . does not operate properly." *Green Book*, *supra*, at 8-11. "Customers with defective items from procurement should submit a supply discrepancy report to the [United States]. The [United States] may be able to resolve the problem by seeking resolution through the contractor under the provisions of the [U.S.] procurement contract." *Id.* In Section 6 of the LOA, the United States agreed to exercise, "upon the Purchaser's request, rights (including those arising under any warranties) the [United States] may have under contracts connected with procurement." J.A. 134. Finally, Section 7 of the LOA addresses dispute resolution. It provides that the LOA is subject to federal procurement law and that any disagreement regarding the LOA between UK MOD and the United States be

---

[2]The *Green Book* is a textbook published by the Defense Institute of Security Assistance Management, the agency responsible for providing research support to advance U.S. foreign policy through security assistance. While the *Green Book* does not represent official agency guidance, it is an attempt to summarize security assistance programs and is based upon the AECA and the *SAMM*, among other sources.

resolved through bilateral consultations and not through referral "to any international tribunal or third party for settlement." J.A. 134.

### C.

The first delivery of the AOCs to UK MOD did not conform to specifications. *Trimble I*, 422 F.3d at 167. Trimble repaired or replaced these AOCs, but not to UK MOD's satisfaction. *Id.* Problems with the chips persisted even after replacement. *Id.* "UK MOD looked to the United States for assistance in recovering its costs from Trimble," but the United States investigated and concluded that it would not take any action against Trimble. *Id.* at 168. UK MOD brought the instant action, claiming that Trimble breached its contract with the United States and that this breach harmed UK MOD as a third-party beneficiary, who could sue to enforce rights under the U.S.-Trimble contracts.

Trimble filed a motion to dismiss, arguing that the district court lacked subject-matter jurisdiction because the Contract Disputes Act applied. This Court held in *Trimble I* that subject-matter jurisdiction was proper in the district court and remanded the case for consideration of whether UK MOD was, in fact, a third-party beneficiary of the U.S.-Trimble contracts. 422 F.3d at 173.

On remand, the district court granted Trimble's motion to dismiss on the basis that UK MOD was not a third-party beneficiary to the U.S.-Trimble agreements and thus had no right to sue upon those agreements. Reasoning that there were no material facts in dispute, finding that UK MOD was a mere known downstream customer of the U.S.-Trimble contracts and finding that the LOA showed that the parties intended the United States to resolve any problems with the AOCs directly with Trimble, the district court concluded that UK MOD was not a third-party beneficiary of the U.S.-Trimble contracts. This appeal followed.

### II.

We review de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Greenhouse*

*v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004). "In general, the motion should not be granted 'unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief.'" *Id.* (quoting *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In considering such a motion, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff. *Mylan Labs.*, 7 F.3d at 1134. In reviewing the dismissal of a complaint under Rule 12(b)(6), we may properly take judicial notice of matters of public record. *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) (citing *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986)). We may consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic, *see Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006). Finally, for purposes of Rule 12(b)(6), "we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

A.

Civil liabilities arising out of the performance by a private contractor of federal procurement contracts are governed by federal common law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-05 (1988). The appropriate test under federal common law for third-party beneficiary status "is whether the contract reflects the express or implied intention of the parties to benefit the third party." *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994); *see Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (adopting *Schuerman* test); *see also Trimble I*, 422 F.3d at 173 ("[B]oth parties agree upon the first prong of the third-party beneficiary test-that is, 'the contract must reflect the intent to benefit the third-party.'" (citing *Montana*, 124 F.3d at 1273)). Thus, the intent of the parties to the contract is "the cornerstone of a claim for third-party beneficiary status." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005). As third-party beneficiary status is exceptional in the law, "the privilege should not be granted liberally." *Flexfab*, 424 F.3d at 1259. Nevertheless, "third-party beneficiary status is not reserved for those parties who benefit expressly under a given contract." *Id.* at 1260. This intent may be determined by the contract itself, as well as "the circum-

stances surrounding its formation." *Trimble I*, 422 F.3d at 173 (quoting *Beverly v. Macy*, 702 F.2d 931, 940 (11th Cir. 1983), and citing 13 Richard A. Lord, *Williston on Contracts* § 37.8 (4th ed. 2000)). In evaluating the surrounding circumstances, if "the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001).

B.

Because Trimble's contract with the United States was part of an FMS transaction authorized under the AECA, our analysis begins with the statute. The AECA implements "the policy of the United States to facilitate the common defense by entering into international arrangements with friendly countries which further the objective of . . . procurement . . . to achieve specific national defense requirements and objectives of mutual concern." 22 U.S.C. § 2751. To this end, the AECA authorizes defense sales to certain foreign governments. *Id.* These sales are government-to-government sales. *See id.* § 2762.

As noted above, foreign governments generally may choose to acquire military goods through either FMS or DCS. Each method has its advantages and disadvantages. For example, through a DCS transaction a foreign purchaser may be able to negotiate more specific contract terms or contract for follow-up support. On the other hand, a foreign purchaser utilizing the FMS program may be able to take advantage of the United States' procurement contract experience or ability to obtain discounted prices. *See Green Book*, *supra*, at 15-3 ("FMS and DoD orders are often consolidated to obtain economy-of-scale buys and therefore significantly lower unit prices."). In most cases, then, the choice between proceeding via FMS or DCS is a strategic decision based upon the needs of the foreign purchaser or defense contractor. *See, e.g.*, *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1341 (M.D. Fla. 2003) ("Lockheed could have contracted directly with the foreign governments in a direct commercial sale, but instead Lockheed opted to use the FMS program, one of the benefits of which is the assurance of payment by the United States Government."); *Green Book*, *supra*, at 15-1 to 15-14 (comparing FMS to DCS, including advantages and disadvantages of each method for the foreign government purchaser).

In exchange for some of the advantages of proceeding via FMS, however, the foreign purchaser must relinquish some benefits. One concession is that the United States "selects the source and *manages the contract*, consistent with the provisions of the FAR and the LOA." *Green Book*, *supra*, at 15-8 (emphasis added). Thus, a foreign purchaser proceeding via FMS necessarily delegates the ability to negotiate and service the contract to the United States. In this case, UK MOD purchased goods that were only available via the FMS program. Thus, the United States made the method-of-purchase decision for UK MOD: if UK MOD wished to purchase AOCs, it had to proceed through the FMS program because of the United States' security interest in GPS-related technologies.

There is no dispute that in a DCS transaction, a foreign government directly contracts with the domestic manufacturer and can sue that manufacturer on the direct agreement. *See, e.g.*, *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341 (8th Cir. 1985). It is also without dispute that the FMS program requires the intermediation of the United States and a back-to-back contract structure. Because the choice of this structure reflects the national security interests of the United States, it would be contrary to the statutory scheme to imply a direct relationship between the domestic contractor and the foreign purchaser by affording third-party beneficiary status to the foreign purchaser on the contractor's agreement with the United States. To recognize such a right of action would allow the foreign purchaser to hold the contractor directly liable for the purchased goods, a level of accountability that may be achieved through a DCS sale. Thus, recognizing such a right would allow the foreign purchaser to gain an advantage of the DCS program in a situation where United States policy (and the statutory scheme chosen to effectuate that policy) explicitly precludes a DCS arrangement. Accordingly, the recognition of UK MOD as a third-party beneficiary of the U.S.-Trimble agreements would be contrary to the AECA because it would afford UK MOD a right exclusive to DCS transactions, a method of purchase not available for the AOCs at issue. Because recognition of third-party beneficiary status in a contract made under a statutory scheme must accord with that scheme, the recognition of such status in this case is barred as a matter of law. *See Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 328 (D. Mass. 2005) ("[C]ase law . . . establish[es] the rule that a beneficiary to a federal contract has the

right to enforce an agreement imposing duties on a person contracting with the government so long as this is consistent with the statutory scheme, and not an end-run on it."). Allowing UK MOD to exercise direct contract rights against Trimble would afford UK MOD a benefit of the DCS structure where United States policy has dictated that the transaction proceed via FMS. Accordingly, any recognition of third-party rights in UK MOD would be an end-run around the AECA and is prohibited.

C.

Assuming, *arguendo*, that recognition of UK MOD's claim is not contrary to the AECA, we must consider whether the United States or Trimble evidenced an intent to benefit UK MOD in their agreements concerning the AOCs. The intent of the United States is evidenced both in its agreement with Trimble and in the LOA with UK MOD. When United States policy dictated that AOC purchases be via FMS-only, it necessarily mandated the use of the back-to-back contract structure of the FMS program.

The U.S.-Trimble agreements do not explicitly mention that they are for the benefit of UK MOD. The agreements do reference UK MOD's FMS case number and state that delivery would be to a freight forwarding facility and then to the UK. There is, however, no provision denoting that Trimble was the exclusive producer of the AOCs for the fulfillment of UK MOD's LOA. The contracts provide that the United States will pay Trimble for the AOCs. There is no mention of any involvement of UK MOD, such as approval of the items, as a condition to Trimble's receipt of payment. *See, e.g.*, *United States ex rel. Campbell*, 282 F. Supp. 2d at 1341 ("Lockheed was obligated to deliver LANTIRN pods to the United States and the United States was obligated to pay Lockheed for the pods; the Government's obligation to pay was not contingent on the receipt of funds from a foreign government.")

The LOA makes clear that claims for discrepancies, including the type of claims that UK MOD wishes to advance in this litigation, must be brought to the United States in compliance with a specified discrepancy procedure, the SDR. This compliance procedure, as explained above, explains that the United States will attempt to

resolve the issue with the contractor. *See Triad Fin. Establishment v. Tumpane Co.*, 611 F. Supp. 157, 159 n.1 (N.D.N.Y. 1985) ("[An FMS] arrangement allows the foreign government to look to the United States for compliance with the contract."). The SDR procedure does not mention any action by the FMS purchaser with regard to the contractor, even in the event that the United States fails to resolve the discrepancy with the contractor. Even assuming, *arguendo*, that the SDR procedure contemplated reserving to the foreign purchaser the right to address discrepancies with the contractor in the event that the United States fails to do so, Section 7 of the LOA explicitly states that any disagreement regarding the LOA between UK MOD and the United States must be resolved through bilateral consultations and not through referral "to any international tribunal or third party for settlement." J.A. 134. A suit against Trimble—a nonparty to the LOA—is a referral to a third-party regarding a disagreement about the LOA.

Thus, the intent of the United States, as evidenced in the LOA, was that UK MOD be conferred the extent of its rights in the AOC purchase through the LOA, rather than the U.S.-Trimble agreements. Furthermore, the LOA expresses that the United States explicitly limited UK MOD's remedies regarding disagreements about the AOC purchase. These restrictions precluded UK MOD from taking any action through third parties or tribunals, instead setting forth a detailed procedure for reporting discrepancies regarding the AOCs to the United States. These provisions clearly evidence the United States' intent that UK MOD not be directly benefitted by the Trimble agreements, but rather receive the benefits of the FMS transaction through the LOA. In addition, the LOA demonstrates that the United States intended to limit UK MOD's remedies to a discrepancy process through FMS channels and foreclosed UK MOD's ability to refer any dispute regarding the LOA to third parties, including Trimble, or tribunals.

In sum, recognizing a beneficiary right of UK MOD to enforce the U.S.-Trimble agreements would be contrary to the intent and structure of the AECA, as well as contrary to the intent of the United States, as evidenced by the U.S.-Trimble agreements and the LOA. Because underlying statutory law prohibits the recognition of third-party beneficiary status and because the intent of the United States was not to

create such status for UK MOD via the U.S.-Trimble agreements, the district court was correct in dismissing UK MOD's complaint.

## III.

We recognize that, as we have stated, the inquiry into third-party beneficiary status is fact sensitive and not ordinarily ripe for resolution at the motion-to-dismiss stage. *See Trimble I*, 422 F.3d at 173. This case, however, presents an exception to the general rule. Because the relevant documents are properly before this Court and the contracts in question were executed under a federal statutory scheme, a resolution of the third-party beneficiary issue is proper at this stage in the proceedings. We find that the statutory scheme, as well as the specific relevant agreements, preclude UK MOD's claiming third-party beneficiary status. Accordingly, additional discovery or proceedings would not affect our conclusion. UK MOD cannot produce any facts, known or unknown, that would alter this outcome. Regardless of any specific interactions between Trimble and UK MOD regarding this particular transaction, recognition of third-party status would be contrary to the AECA. As such, we believe it appropriate to resolve this issue on Trimble's 12(b)(6) motion.

## IV.

Because as a matter of law UK MOD cannot establish that it was a third-party beneficiary to any of the Trimble-United States agreements, we affirm the district court's decision to grant Trimble's motion to dismiss.

*AFFIRMED*

TRAXLER, Circuit Judge, dissenting:

In the first appeal of this case, we declined to reach the issue of UK MOD's status as a third-party beneficiary to the contracts between Trimble Navigation Limited and the United States Air Force. *See United Kingdom Ministry of Defence v. Trimble Navigation Ltd.*, 422 F.3d 165, 173 (4th Cir. 2005) ("*Trimble I*"). We remanded for further proceedings on this issue, including a determination of "whether the

parties to the contract intended to bestow a benefit on a third party." *Id.* (internal quotation marks omitted). We noted that this "fact-sensitive inquiry" should be "based upon both the relevant contract and the circumstances surrounding the contract." *Id.*

On remand, the district court dismissed UK MOD's complaint under Rule 12(b)(6), concluding, based on the contract documents, that "there are no material facts in dispute" and "the record does not support the conclusion that the United States and UK MOD intended that UK MOD would be directly benefitted by the contract between the United States and Trimble." J.A. 260.*

Thus, we address the issues raised in this appeal in the procedural context of Trimble's motion to dismiss under Rule 12(b)(6). A party moving to dismiss a complaint under Rule 12(b)(6) is "test[ing] the sufficiency of [the] complaint" and asserting, in effect, "that the plaintiff [is not] entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged.*" *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (internal quotation marks omitted). The court should grant a Rule 12(b)(6) motion only "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Id.* at 244. Rule 12(b)(6), therefore, limits the court's inquiry; it is not a vehicle for the court to assess the record or "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1993).

With these principles in mind, I would hold that the allegations in UK MOD's complaint are sufficient at this point to state a claim and survive the motion to dismiss. First, I do not believe Congress, in

---

*Because UK MOD's intent is not relevant to its status as a third-party beneficiary to a contract between the Air Force and Trimble, the district court in all probability meant that "the record does not support the conclusion that the United States and *Trimble* intended that UK MOD would be" a third-party beneficiary to "the contract between the United States and Trimble."

enacting the Arms Export Control Act ("AECA"), *see* 22 U.S.C. §§ 2751-2799aa-2, precluded third-party beneficiary rights in this context. Second, UK MOD's complaint states a third-party beneficiary claim under the favorable pleading standards applicable at this procedural juncture. I would therefore reverse the decision of the district court and remand for further proceedings.

I.

Trimble contends that the structure of the AECA, as well as the general purpose of the AECA, preclude a disappointed foreign government purchaser in a Foreign Military Sales ("FMS") transaction from seeking redress as a third-party beneficiary. An FMS transaction under the AECA involves the sale of military defense items by the United States to a foreign country in a government-to-government transaction; the items to be sold are either procured by the United States or sold directly from the stocks of the United States Department of Defense. *See* 22 U.S.C. §§ 2761 ("Sales from stocks"), 2762 ("Procurement for cash sales"). A "procurement for cash sales" arrangement under § 2762 involves two separate contracts — a procurement contract between the United States and the defense contractor and the sales agreement between the United States and the foreign government. *See* 22 U.S.C. § 2762(a); *Trimble I*, 422 F.3d at 167. In addition to these statutorily prescribed methods, a foreign government may also purchase defense articles directly from the manufacturer in a Direct Commercial Sale ("DCS"). The President, however, has discretion "to designate which military end-items must be sold through FMS channels exclusively." Security Assistance Management Manual (SAMM) § C4.5.9, *available at* http://www.dsca.osd.mil/samm/ (last visited May 1, 2007); *see* 22 U.S.C. § 2778. In this case, because the Department of Defense does not maintain a stock of Trimble's Auxiliary Output Chips ("AOCs"), UK MOD and the United States entered into a Letter of Acceptance under which the United States agreed specifically to procure Trimble AOCs on behalf of UK MOD "through a contract between the United States Air Force and Trimble." J.A. 12.

Trimble contends that where procurement is required to fulfill the terms of a Letter of Agreement, as is the case here, the "back-to-back" contract structure necessarily precludes the third-party beneficiary theory being asserted by UK MOD — the foreign government does

not have a direct contractual relationship with the private manufacturer and therefore must pursue whatever remedies are available under its agreement with the United States government. In other words, Trimble suggests that UK MOD is attempting to invoke a remedy that is available only in a DCS transaction.

In my view, the statutory provisions relied upon by Trimble do not indicate one way or another whether UK MOD can claim third-party beneficiary status. The mere fact that a procurement for cash transaction does not involve a direct contractual relationship between the foreign purchaser and the defense contractor does not dictate that UK MOD's claim is statutorily barred. Indeed, *any* third-party beneficiary claim assumes the plaintiff does not have a direct contractual relationship with the defendant. Thus, allowing UK MOD to proceed on its theory would not afford it a remedy available only in a DCS transaction, *i.e.*, a direct contractual claim. Trimble has not pointed to any provision of the AECA or any regulation issued thereunder indicating that UK MOD's remedies are circumscribed in the manner suggested.

Trimble also asserts that the authority of the United States government to exert control over many aspects of the sale of an FMS item under the AECA — including, most significantly, the power to terminate the sale completely — precludes third-party rights. Again, the provisions cited by Trimble simply do not bear upon what recourse UK MOD may seek in an FMS transaction. Moreover, because the government's power to terminate applies to DCS transactions as well as FMS transactions, I fail to discern how the authority to terminate affects third-party beneficiary rights either way. *See* Defense Institute of Security Assistance Management, *Online Green Book: The Management of Security Assistance* 15-13, http://www.disam.dsca.mil/pubs/DR/greenbook.htm.

To the extent that Trimble cites and relies upon the general statutory purpose of the AECA, I do not find such broad language particularly instructive. The AECA contains a very broad policy statement that, in view of "[t]he need for international defense cooperation among the United States and those friendly countries to which it is allied" and the fact that the effectiveness of such cooperation "is directly related to the . . . compatibility of their defense equipment," the United States Government is authorized to sell defense articles to

allies to "further the objective of applying agreed resources of each country . . . to achieve specific national defense requirements and objectives of mutual concern." 22 U.S.C. § 2751. If anything, the language suggests that the AECA is aimed at facilitating rather than restricting the sale of defense items to foreign governments. Theoretically, the availability of third-party beneficiary claims would be consistent with such a policy.

## II.

Having concluded that the AECA does not preclude a third-party beneficiary claim by UK MOD, I would hold that UK MOD's complaint sets forth sufficient facts to survive a motion to dismiss under Rule 12(b)(6). "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *See Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (internal quotation marks omitted). Although the beneficiary "must fall within a class clearly intended to be benefitted" by the contract, "the intended beneficiary need not be specifically or individually identified in the contract." *Id.* at 1260 (internal quotation marks and alteration omitted). The court, "[w]hen determining whether the parties to the contract intended to bestow a benefit on a third party, . . . may look beyond the contract to the circumstances surrounding its formation." *Trimble I*, 422 F.3d at 173 (internal quotation marks omitted). The complaint asserted that the "AOCs purchased by UK MOD . . . were manufactured by Trimble pursuant to four contracts that had been awarded to Trimble by the U.S. Air Force on behalf of UK MOD." J.A. 12. As alleged by UK MOD, each of the contracts between the Air Force and Trimble specifically referenced the FMS case number assigned to the agreement between the United States and UK MOD for the purchase of Trimble AOCs. Additionally, the Trimble procurement contracts "stated that the Trimble AOCs were to be delivered to UK MOD." J.A. 13. Moreover, in response to the district court's inquiry at oral argument regarding any additional facts relevant to the intent of the parties, UK MOD explained that "the evidence when developed during the course of discovery will show not only [that] Trimble was fully aware that . . . the United Kingdom was the intended beneficiary of these contracts but that Trimble actually went after this business

with the UK. They met with the UK. They were competing with another contractor. [Trimble] shared specifications with the UK, and . . . the UK specifically identified Trimble as opposed to the other contractor in the LOA" and indicated to the United States its preference for Trimble AOCs. J.A. 224.

Dismissal at this point, prior to discovery, is premature in my opinion. UK MOD has alleged sufficient facts to state a claim and continue pursuing its action through the discovery process. Therefore, I respectfully dissent.